Charles G. CRISWELL, Albert Ron, Rulon H. Starley, Plaintiffs,

v.

WESTERN AIR LINES, INC., Defendant.

No. CV 78–2184 AWT.

United States District Court, C. D. California.

May 12, 1981.

Raymond C. Fay, and Alan M. Serwer, Haley, Bader & Potts, Chicago, Ill., for plaintiffs.

Paul L. Giannini, Darling, Hall, Rae & Gute, Los Angeles, Cal., William John Kennedy, Beverly Hills, Cal., for defendant.

## MEMORANDUM OPINION

TASHIMA, District Judge.

*Introduction*

This is an action under Section 7 of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 626,[1] brought by two former captains and a second officer for damages and equitable relief, including reinstatement. The complaint alleges, in essence, that the refusal of defendant Western Air Lines, Inc. ("Western") to continue them in employment as second officers after their respective sixtieth birthdays was in violation of Section 4(a) of the ADEA (§ 623(a)).[2] All three plaintiffs sought preliminary injunctions *pendente lite*. The application of plaintiff Ron, who was then a second officer, was granted and those of plaintiffs Criswell and Starley, who were then captains, were denied. Thus, plaintiff Ron has been continued in his employment and plaintiffs Criswell and Starley have been retired since shortly after the commencement of this action.

Pursuant to plaintiffs' demand therefor, this matter was first tried to a jury. After a 15-day trial,[3] the jury returned verdicts for all three plaintiffs, assessing damages in the amounts of $60,393.87, $52,088.94 and $5,000, for plaintiffs Criswell, Starley and Ron, respectively. The jury further found that Western's violations of the ADEA were "willful" with respect to each plaintiff. ADEA, § 7(b), (§ 626(b)).

The jury having performed its function, the Court must now address the issue of equitable relief.

*The Prima Facie Case*[4]

Plaintiff Criswell was involuntarily retired by Western in July 1978, upon attaining his sixtieth birthday. Prior to his retirement, Criswell had been employed by Western for 41 years, the last 37 of which was as a pilot. At his retirement and for a number of years prior thereto, Criswell had been a DC–10 captain. Prior to reaching his sixtieth birthday, Captain Criswell submitted a bid to become a DC–10 second officer. This bid was made in accordance with Western's established procedures which, to the extent applicable, conformed to the requirements of the collective bargaining agreement (the "Pilot Agreement") between Western and the Air Line Pilots Association ("ALPA"), the union which represented Western's flight deck personnel. On Western's wide-bodied aircraft (DC–10's) the second officer is the third member of the flight deck crew and is equivalent to a flight engineer, as that term is employed

---

1. Parallel citations to the codification of the ADEA in Title 29, United States Code, will be by parenthetical reference to the codified section number only.

2. *Pendent* state claims alleged in the complaint were dismissed prior to trial.

3. An additional day of trial (an evidentiary hearing), the Court sitting without a jury, was held after the verdict was returned, where the parties were permitted to adduce any further evidence deemed relevant on the issues of whether or not equitable relief was proper and, if so, the scope of such relief.

4. The facts as set forth herein and in other sections of this memorandum opinion are in-

tended to serve as findings of fact, pursuant to Rule 52(a), Fed.R.Civ.P. In this action seeking both damages and equitable relief, the question of whether or not the Court is required to accept the findings of the jury in making the specific findings of fact which will support the granting of equitable relief, *see, e. g., Cleverly v. Western Elec. Co.*, 450 F.Supp. 507, 511 (W.D.Mo.1978), *aff'd*, 594 F.2d 638 (8th Cir. 1979), is moot because the court is in full agreement with the jury insofar as its verdict may govern findings necessary for equitable relief and because the verdict was a general verdict only, none of the findings herein conflict with the jury's verdict.

by the Federal Aviation Administration ("FAA").

Captain Criswell's bid was rejected by Western, not because there were no second officer openings or because none were contemplated or for any other reason normally associated with consideration of bids by flight deck personnel, but *solely* because he was approaching age 60 and because Western had a policy which required all flight deck personnel to retire at age 60.

Plaintiff Starley was also involuntarily retired by Western at age 60 in July 1978. The circumstances of his retirement, however, are even more explicitly age-related and deserve recounting because they clearly indicate that Western, beyond any doubt, has enforced a mandatory retirement rule at age 60 for all flight deck personnel.

Starley had been employed by Western as a pilot or copilot for 32 years and had been a DC–10 captain for the last five years prior to his retirement. One year prior to his sixtieth birthday, Captain Starley learned that Western would soon have DC–10 second officer openings, resulting from the acquisition of new aircraft. After discussing the matter with Western's Vice President for Flight Operations, Captain Starley, in September 1977, submitted a bid for a DC–10 second officer position. In the following month, the bid was actually awarded to Captain Starley and he discussed with Western personnel the training normally given by Western to flight deck personnel who move from one position to another. In February 1978, Western changed its position and, claiming that the position had been awarded to him in error, informed Captain Starley that he would be retired at age 60, which was the normal retirement age set forth in its pilot pension plan negotiated with ALPA.

Plaintiff Ron, whose sixtieth birthday was in June 1978, is a "career" second officer with Western, neither having been required to nor chosen to advance to first officer (copilot) or captain (pilot). He has been employed by Western since 1945 and as flight engineer or second officer since 1954. He, too, discussed staying on with Western with its management personnel and in December 1977 gave Western written notice of his intention to remain past his sixtieth birthday in his then position of DC–10 second officer. In February 1978, Western informed Ron, as it had Starley, that he would be retired at the normal retirement age of 60 under the pilot pension plan.

As indicated earlier, a preliminary injunction was issued in Ron's favor, prohibiting Western from terminating his employment as a second officer pending the outcome of this lawsuit. Plaintiff Ron has, thus, continued to fly the line for Western as a DC–10 second officer during the two and one-half years between the commencement and trial of this action. He has continued to perform all of the normal duties of DC–10 second officer on both domestic and international flights efficiently, without untoward incident and without any complaint from flight operations management respecting his job performance.

Given the facts summarized above, Western conceded that plaintiffs had established a *prima facie* violation of the ADEA. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Kelly v. American Standard, Inc.*, 640 F.2d 974, 980 (9th Cir. 1981). Western's case, rather, was predicated on two statutory defenses. Its first defense was that retirement of second officers at age 60 was a "bona fide occupational qualification reasonably necessary to the normal operation" of its business ("BFOQ"). ADEA, § 4(f)(1), (§ 623(f)(1)). Its second defense was that its policy of not allowing captains to "downbid" to second officers was "based on reasonable factors other than age." *Id.* This defense, which was asserted against plaintiffs Criswell and Starley only, was combined with the non-statutory "business necessity defense" ("BND"). *See Harriss v. Pan American World Airways, Inc.*, 649 F.2d 670 at 674 n.2 (9th Cir. 1980). All of these defenses were overlaid with a special gloss applied in cases involving public carriers which "have uniformly recognized the

relevance of the safety factor" in assessing the justification for these defenses.[5] *E. g., Id.* 675 n.4; *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224, 236 (5th Cir. 1976). We turn then to an analysis of Western's defenses.

*The BFOQ Defense*

Western's BFOQ defense has its genesis in the FAA's Age 60 Rule, 14 CFR § 121.383(c). This rule prohibits certificated air carriers, such as Western, from employing pilots or copilots past age 60. It is based on the FAA's determination that the onset of disease and other debilitating conditions is age-related and that there is no practical way of predicting in pilots over age 60 on an individual basis whether such a disease or condition which would pose a flight or safety risk would occur. This exercise of the FAA's discretion, based on its special expertise, has been upheld by the courts. *See, e. g., Keating v. FAA,* 610 F.2d 611 (9th Cir. 1979). The Age 60 Rule has also been recognized as a BFOQ for commercial airline pilots and copilots.[6] The rule, however, by its own terms, has no application to flight engineers. Western's contention is that the same reasons which support the Age 60 Rule for pilots support its application by Western to its second officers.

As might be expected, testimony on this subject was conflicting. Western relied primarily on the expert opinion of a former FAA Deputy Federal Air Surgeon. His testimony was that the onset of at least certain diseases is age-related, that with advancing age the likelihood of onset of disease increases and that in persons over age 60 it could not be predicted whether and when such diseases would occur. In particular, he was concerned with the occurrence of a cardiovascular event, such as a miocardial infarction, in flight.

On the other hand, plaintiffs' experts, a medical doctor of aerospace medicine and aging and a professor of psychiatry, specializing in the psychology of aging, cognition and gerontology, testified to the contrary. In their opinion, physiological deterioration is not caused by nor does it necessarily accompany aging between the ages of 60 and 70. There are a number of healthy individuals older than age 60 and it is not unusual for an individual over age 60 to be healthier than a much younger person. Deterioration is caused by disease and not by aging. The aging process itself, which commences at conception, occurs at different rates in different individuals and the differences which result from these differential rates becomes increasingly pronounced in increasingly older age groups. Plaintiffs' expert on aerospace medicine also testified that it was feasible to determine on the basis of individual medical examinations whether flight deck crew members, including those over age 60, were physically qualified to continue to fly.

The jury's verdict is consistent with a finding that application of the Age 60 Rule to Western's second officers was not reasonably necessary to the essence of its business, that Western did not have a sufficient factual basis for believing that second officers past age 60 would be unable to perform their duties safely and efficiently and that it was not highly impractical to deal with second officers past age 60 on an individual basis.[7] *See Harriss, supra* at 676. The court concurs in this finding.[8]

---

5. In this case, the presence of the safety factor is predicated on Western's statutory duty, as a certificated air passenger carrier, to render its services "with the highest possible degree of safety in the public interest...." 49 U.S.C. § 1421(b).

6. 29 CFR § 860.102. One court has applied this rule, by analogy, to non-commercial pilots, concluding that as a matter of law a mandatory retirement age of 60 for such pilots was a BFOQ. *Tuohy v. Ford Motor Co.,* 490 F.Supp. 258 (E.D.Mich.1980).

7. The BFOQ instruction stated:

"*BFOQ Defense.* If you find that plaintiffs have persuaded you by a preponderance of the evidence that their involuntary retirements were the result of policies in which age discrimination was a determining factor, then you must consider defendant's defense that age is a 'bona fide occupational qualification' for its Second Officers (flight engineers). This defense is usually abbreviated 'BFOQ'. The BFOQ defense is available only

8. See note 8 on page 390.

This finding, that Western did not carry its burden of proof on the BFOQ defense, is also supported by non-medical evidence. First, a distinction must be made between the duties of a flight engineer, on the one hand, and the duties of a pilot (including copilot), on the other. On a wide-bodied aircraft the flight engineer sits at his own instrument panel. His function during normal flight is to monitor and adjust a number of the systems which are necessary to the operation of the aircraft, such as the hydraulic and electrical systems. He does not manipulate the flight controls. Thus, his normal duties are less critical to the safety of flight than those of a pilot. He does have important contingency duties in emergency situations, such as an all-engine flameout. Even if the flight engineer were to become incapacitated in flight, the crew redundancy concept employed by Western and other carriers provides for other members of the flight deck crew to perform the necessary procedures of the flight engineer until the aircraft can be landed at the nearest available airport. Although testimony at the trial indicated that a number of tragedies have resulted from pilot incapacitations during flight, none has ever come about because of the incapacitation of a flight engineer.

The record also reveals that both the FAA and the airlines have been able to deal with the health problems of pilots on an individualized basis. Pilots who have been grounded because of alcoholism or cardiovascular disease have been recertified by the FAA and allowed to resume flying. Pilots who were unable to pass the necessary examination to maintain their FAA first class medical certificates, but who continued to qualify for second class medical certificates were allowed to "downgrade" from pilot to second officer. There is nothing in the record to indicate that these flight deck crew members are physically better able to perform their duties than flight engineers over age 60 who have not experienced such events or that they are less likely to become incapacitated. *Harriss, supra*, at 679–682 (Schroeder, J., dissenting).

As indicated earlier, the Age 60 Rule has never been applied by the FAA to flight engineers. Western's expert testified that during the period that he was the Deputy Federal Air Surgeon, he never recommended or advocated that it be so applied. A number of other commercial air carriers, including American, TWA and Pan American, have flight engineers older than age 60 flying the line. The evidence indicates that there are in excess of 200 such flight engineers on wide-bodied aircraft. Taking the airline pilot population as a whole, approximately one-half of them are employed by carriers which do not impose an Age 60 Rule on flight engineers.[9]

---

if it is reasonably necessary to the normal operation-essence-of defendant's business. In this regard, I instruct you that the normal operation-essence-of Western's business is the safe transportation of air passengers.

"The burden of proof to show a BFOQ is on the defendant. If defendant establishes such a BFOQ by a preponderance of the evidence, then its age discrimination is lawful under the ADEA.

"One method by which defendant Western may establish a BFOQ in this case is to prove "(1) that in 1978, when these plaintiffs were retired, it was highly impractical for Western to deal with each Second Officer over age 60 on an individualized basis to determine his particular ability to perform his job safely, and

"(2) that some Second Officers (flight engineers) over age 60 possess traits of a physiological, or other nature which preclude safe

and efficient job performance that cannot be ascertained by means other than knowing their age.

"In evaluating the practicability to defendant Western of dealing with Second Officers over age 60 on an individualized basis, with respect to the medical testimony you should consider the state of the medical art as it existed in July 1978."

8. In making this and its other findings on Western's defenses, the Court is mindful that it is only the burden of proof and not the ultimate burden of persuasion that shifts to the defendant. *Texas Dept. of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981).

9. With respect to pilots, it is somewhat of an irony that the FAA does not apply its Age 60 Rule to its own pilots who fly that agency's fleet, which consists of aircraft as large as

Based on all of the factors discussed above, I find from the record in this case that retirement at age 60 for second officers, or flight engineers, is not a bona fide occupational qualification reasonably necessary to the normal and safe operation of Western's business.

*BND/Reasonable Factors Other Than Age Defense*

■ Western claimed that rejection of Criswell's and Starley's bids to become DC–10 second officers was the result of a facially neutral "downbidding" policy. In response to plaintiffs' showing that this downbidding policy had a disparate impact on 59 year old captains, Western responded that the policy was necessary to the safe and efficient operation of its business. For essentially the same reasons, Western further claimed that its refusal to accept these downbids was based on reasonable factors other than age.

All of Western's pilots and flight engineers, both in active service and on furlough, are carried on a pilot seniority list.[10] Under the Pilot Agreement, all line assignments are made according to seniority. Seniority is established by a pilot's date of hire as a pilot. At the time of their retirements, Criswell and Starley were at or near the top of the pilot seniority list and, thus, entitled to bid preference. A number of variables enter into pilot assignments including home base, type of aircraft, cockpit position and assigned flights. Whenever a line vacancy opens, e. g., a DC–10 captain based in Honolulu or a B–727 first officer based in Los Angeles, the vacancy is posted and bids for the position are accepted from all pilots on the seniority list. Normally, the vacancy is awarded to the pilot highest on the seniority list who has made a bid for the position. Because the higher the position and the larger the aircraft, the greater will be the salary, naturally, most bids are to bid upward in order to improve the bidding pilots' economic position. This seniority system has resulted in the more experienced pilots flying the more important positions and the larger aircraft. Another result of this seniority system is that the only positions available for new pilots, *i. e.*, those not already on the seniority list, are lower positions on narrow-bodied aircraft.

Western refers to this seniority system as its "up or out" system. In fact, Western requires its new second officers to become qualified as pilots within a certain period of time. If a pilot cannot or will not advance when openings are available, he or she will be terminated.[11] Western views this system as a means of training its pilots for the more important positions, as a pilot will normally be required to attain a number of years of service flying the line for Western as a pilot before becoming eligible to be a DC–10 captain.[12] It is, thus, Western's position that under its seniority system and up or out system "downbids" are the exception rather than the rule and that the Criswell and Starley downbids do not fall within any recognized exception. Therefore, that its refusal to accept their downbids was justified under the BND and was the result of reasonable factors other than age.[13]

B--707's. The U.S. Navy, based on its "1000 Aviator Study," has recently rescinded its age limitation policy for pilots.

**10.** For purposes of seniority, pilots and flight engineers are all treated as pilots, *i. e.*, they are all carried on a single, integrated list.

**11.** As stated earlier, by agreement with ALPA, an exception to this up or out policy is a group of career second officers, including plaintiff Ron, who have been permitted to remain as second officers and not advance to first officer or captain.

**12.** Whatever else may accompany or result from the aging process, the parties agree that as a part of the maturation process a pilot's judgment improves with age.

**13.** It is recognized that plaintiffs Criswell and Starley had no right to retain their positions as DC–10 captains under the Age 60 Rule and that Western was not obligated to offer them new positions where none existed upon their attaining age 60. Thus, the gist of their ADEA claim is that Western refused to award them second officer bids where such positions were available prior to their reaching age 60 and to which they were entitled by virtue of their positions on the pilot seniority list.

Western contends that its downbid policy permits downbids only in a few and carefully controlled circumstances. A "downbid," as implied above, is a pilot bid to move from one cockpit position to a lower position, e. g., from captain to first officer, or to move in the same position from a larger to a smaller aircraft (a downbid within status), e. g., from DC–10 captain to B–727 captain. The Criswell and Starley downbids here involved were from DC–10 captain to DC–10 second officer. These downbids were, in fact, the subject of grievances filed under the Pilot Agreement and were arbitrated by the Western Airlines Pilots System Board of Adjustment. Western's denial of these downbids was held by the System Board not to have been in violation of the Pilot Agreement, based on its finding that Western was opposed in principle to downbidding and permitted it "only in rare and carefully defined circumstances." [14]

The evidence at trial, however, belied this contention. Western has permitted, and in certain circumstances required, downbidding in hundreds of instances in a wide variety of circumstances and almost without exception by younger pilots. The only circumstances in which Western has consistently denied downbids is by captains nearing age 60. During the period 1972 to 1979, Western has permitted downbids by or involuntarily downgraded [15] more than 400 pilots. These included pilots downbidding from captain to first officer, from captain to second officer and from first officer to second officer, as well as downbids within status. Of special significance to this case is Western's policy, instituted in 1975, of medical downgrades. Under this policy a captain or second officer who cannot hold a FAA first class medical certificate but can hold a second class medical certificate is permitted to continue flying the line as a second officer. Four pilots have been downgraded by Western under this policy

including a DC–10 captain who became a second officer at age 56. Downgrades also have occurred as a result of "displacements," which are caused by curtailment of flights and flying time and consequent downward "bumping" by senior pilots whose flights have been cancelled. Testimony indicated that at least on one occasion a displaced DC–10 captain who was high enough on the pilot seniority list to continue to hold on to a DC–10 captaincy was allowed to assume a DC–10 second officer position.

Numerous downbids have also been exercised under the widebody downbid provision of the Pilot Agreement. These are downbids which a pilot exercises in order to obtain a position on a widebodied aircraft. There is no restriction on the number of times a pilot can exercise such a downbid and a number of pilots have done so more than once. There was evidence also of a number of downbids permitted by Western, such as "hardship" downbids, which are not sanctioned by any provision in the Pilot Agreement, as is the case with disciplinary downgrades.

It is clear from the above evidence that Western's downbidding policy is not one of allowing downbids in only a few exceptional circumstances, but has sanctioned hundreds of downbids in a wide variety of circumstances, including downbids and downgrades for reasons of health and unilateral downbids not approved by ALPA or the Pilot Agreement. This downbid policy was administered in such a way as to have a disparate impact on pilots nearing their sixtieth birthday.

For these reasons, I find that Western's refusal to accept Captain Criswell's downbid to DC–10 second officer and its rejection of Captain Starley's downbid after it had been accepted, were not based on "reasonable factors other than age" and, in fact, such action was taken substantially and pri-

14. The awards of the System Board and the opinion of its neutral arbitrator were admitted into evidence to be "accorded such weight as the court deems appropriate." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 & n.21, 94 S.Ct. 1011, 1025 n.21, 39 L.Ed.2d 147 (1974).

15. A "downgrade" has the same effect as a downbid; it is, however, not voluntarily initiated by the pilot.

marily because Criswell and Starley were approaching their sixtieth birthdays. Western had a policy of retiring all flight deck personnel—whether pilots or flight engineers—at age 60 and Western's actions in rejecting these downbids was in accordance with and motivated by that policy. Thus, although, as indicated earlier, substantial evidence supports the claim of Criswell and Starley of disparate impact and Western's BND lacks any substantial evidentiary basis, because of this finding that age was a substantial and determinative factor in Western's action in denying these downbids, the BND must also fail for this reason. I find that Western did not carry its burden of showing that the denial of the Criswell and Starley downbids were "necessary to the safe and efficient ... performance" either of Western's business of safe transportation of air passengers or of the duties of second officers. *Dothard v. Rawlinson*, 433 U.S. 321, 332 n.14, 97 S.Ct. 2720, 2728 n.14, 53 L.Ed.2d 786 (1977); *Harriss, supra* at 679.

*Pretext*

Although evidence was received at the trial on plaintiffs' claim of pretext and the jury was instructed on this element, in view of the foregoing findings regarding the *prima facie* case and the defenses of BFOQ and BND/Reasonable Factors Other Than Age, for purposes of determining the scope of equitable relief, I conclude that it is unnecessary to make any findings on this issue.

*Right to Jury Trial*

■ In this case, the jury was asked to return only a general verdict with respect to each plaintiff's claim (in addition to answering a special interrogatory with respect to willfulness). For this reason, Western contends that the Court cannot order equitable reinstatement of plaintiffs without depriving Western of its right to jury trial under the ADEA. Because the jury was instructed on pretext, Western argues that it is possible that the jury may have accepted either or both of its defenses, but found that they were pretextual and returned its general verdict in plaintiffs' favor on this basis.

The statute provides that in ADEA actions

"a person shall be entitled to a trial by jury of any issue of fact in any such action for recovery of amounts owing as a result of a violation of this chapter, regardless of whether equitable relief is sought by any party in such action."

ADEA, § 7(c)(2), (§ 626(c)(2)). The statute grants a right to trial by jury "of any issue of fact in any such action for recovery of amounts owing." I interpret this as a grant of the traditional right to jury trial, *i. e.*, on all issues of fact necessary to the recovery or non-recovery of damages. So long as the jury is permitted to first exercise its fact finding powers, the Court is then entitled—indeed, required—to make its factual determinations, at least insofar as its findings are not inconsistent with the verdict. *Bruckman v. Hollzer*, 152 F.2d 730 (9th Cir. 1946). Nothing in this 1978 amendment to the statute or its legislative history suggests that Congress intended to disturb this long-standing division of fact finding duties between the jury and the court in an action where both damages and equitable relief are proper.

Indeed, the legislative history makes clear that Congress' only intent in enacting the 1978 amendment was to insure the right to jury trial on all issues necessary for "legal relief." The amendment was occasioned by the Supreme Court's decision in *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), which upheld the right to jury trial in an ADEA action for lost wages. However, the right to jury trial on a claim for liquidated damages was left open and it was this narrow question that was addressed by the amendment.

"The House recedes with an amendment which provides for a jury trial on any issue of fact in an action for recovery of amounts owing as a result of a violation of the ADEA.

\* \* \* \* \* \*

"Because liquidated damages are in the nature of legal relief, it is manifest that a

party is entitled to have the factual issues underlying such a claim decided by a jury . . . ."

House Conf.Rep.No.95–950, pp. 13–14, *reprinted in* [1978] U.S.Code Cong. & Ad. News 504, 528, 535.

■ For these reasons, I reject Western's contention that because special interrogatories were not submitted to the jury, the Court is powerless to decide plaintiffs' equitable claims.

### Scope of Equitable Relief

■ Willful violations of the ADEA having been established, the Court must now consider the appropriate equitable relief to be granted. Based upon its legislative findings, Congress declared the purpose of the ADEA is "to promote employment of older persons based on their ability rather than age" and "to prohibit arbitrary age discrimination in employment." ADEA, § 2(b), (§ 621(b)). The Court's equitable decree must be fashioned to fully effectuate these statutory purposes.

■ A permanent injunction will, therefor, be issued requiring plaintiffs Criswell and Starley to be reinstated by Western, such reinstatement to be with full seniority on the pilot seniority list, as of their original dates of hire as pilots. Because, given this standing in seniority, Criswell and Starley were entitled to have their DC–10 second officer bids accepted, they shall be immediately returned to Western's payroll at salaries fully reflecting their positions and seniority. Plaintiffs Criswell and Starley shall then be afforded such customary training as is given by Western to flight deck personnel similarly situated (*i. e.*, DC–10 captains downbidding or downgraded to DC–10 second officers). Upon the successful completion of such training, they shall be permitted to select such DC–10 second officer positions as they would have been entitled to if they had not been involuntarily retired.

■ In connection with the reinstatement of Criswell and Starley, the Court has considered Western's claim that such reinstatement will cause displacement of less senior pilots and the ultimate furlough of the two active pilots at the bottom of the pilot seniority list. Although such a result is unfortunate and may be inevitable in a shrinking economy, the Court must assume that such a possibility was within the contemplation of Congress in enacting the ADEA. Such displacement is not a sufficient reason not to fully effectuate the ADEA. *Cf. Franks v. Bowman Transp. Co.*, 424 U.S. 747, 778–79, 96 S.Ct. 1251, 1270–1271, 47 L.Ed.2d 444 (1976).

### Pension Rights

■ Plaintiffs contend that their reinstatement and Ron's continued employment should be, in order to fully effectuate the ADEA's purpose, with full pension benefits under the Pilot Pension Plans.

The Pilots Variable Pension Plan is a defined contribution plan and plaintiffs' reinstatement should be with full rights under this plan. Western will be ordered to make the contributions to this plan on behalf of plaintiffs Criswell and Starley as if they had continued as DC–10 second officers from the dates of their respective sixtieth birthdays. Western is also to restore to these plaintiffs' accounts all sums paid out of the Variable Plan to them since their respective sixtieth birthdays, because the jury was instructed to deduct these payments in calculating its back pay awards. Plaintiff Ron's Variable Plan account has been undisturbed because of the preliminary injunction and should remain so.

With respect to the Pilots Fixed Pension Plan, a more difficult question is presented. The normal retirement age under this plan is 60. This is a defined benefit plan and with respect to such plans, Department of Labor interpretive regulations provide:

"A defined benefit plan need not provide for the accrual of benefits for an employee who continues to work after normal retirement age."

29 CFR § 860.120(f)(1)(iv)(B)(5).

Based on this provision, plaintiffs virtually concede and the Court concludes that plaintiffs are not entitled to any increases

in their Fixed Plan pensions which might result from benefit accruals based on additional years of service or other credits. The regulations further provide:

"A defined benefit plan need not take into account salary increases and benefit improvements under the plan which take place after an employee reaches the normal retirement age specified in the plan with respect to those employees continuing their employment beyond that age. However, benefit improvements for retirees may not be denied to such employees who do not receive the advantage of benefit accruals and increases given younger employees."

29 CFR § 860.120(f)(1)(iv)(B)(7).

Based on the second sentence of this latter provision, however, plaintiffs contend that they are entitled to any increase in the "Minimum Normal Pilot Pension" which becomes effective between their sixtieth birthdays and their actual retirement dates. In fact, one such increase has already been made and it appears that for most pilots the negotiated minimum exceeds the "normal" or accrued pension benefit. Plaintiffs contend that this is a "benefit improvement" under the second sentence of § 860.-120(f)(1)(iv)(B)(7). However, that sentence refers only to such improvements for "retirees." Benefit improvements which apply to "employees" are governed by the first sentence. Plaintiffs, after reinstatement, will be employees and not retirees. Therefore, I conclude, giving deference to the administrative agency's interpretive regulation, see 29 CFR § 860.1, that under the statute, ADEA, § 4(f)(2), (§ 623(f)(2)), plaintiffs are entitled to neither additional accrued benefits after age 60 nor benefit improvements negotiated for employees under the Fixed Plan which become effective after their sixtieth birthdays.

Under this interpretation of the ADEA and the regulations, plaintiffs were entitled to commence receiving Fixed Plan pension benefits on their sixtieth birthdays. The jury, however, was instructed (Instruction No. 34) that "any amount received under the Western-ALPA Fixed and Variable Pilot Pension Plans" should be deducted from the wages which plaintiffs lost. The economic effect of this instruction was to leave plaintiffs Criswell and Starley in the same position as if they had never commenced receiving Fixed Plan pension benefits and the Court's decree should take this into account.

Western will be ordered to restore to the Fixed Plan pension trust an amount equal to all Fixed Plan pension benefits paid to plaintiffs Criswell and Starley. Each plaintiff shall elect whether to commence receipt of Fixed Plan benefit payments retroactive to his sixtieth birthday or upon his actual retirement. Any election of retroactive commencement of Fixed Plan pension payments shall be at the statutory interest rate of seven percent (7%) per annum from accrual to payment. If any plaintiff elects deferral of Fixed Plan benefits to his actual retirement date, his benefits shall be actuarially adjusted to reflect the shorter life expectancy resulting from such deferred commencement.

*Adjustment of Damages*

Plaintiffs ask that further damages be awarded by the Court for lost wages between the time of the verdict and the judgment to be entered pursuant hereto. This Circuit now appears to have approved the use of the district court's equitable powers under ADEA, § 7(b), (§ 626(b)), to adjust a jury's award of damages when necessary to give complete relief. *Kelly v. American Standard, Inc., supra*, 640 F.2d at 982, 985–86; *see also, Loeb v. Textron, Inc.*, 600 F.2d 1003, 1020 (1st Cir. 1979). Plaintiffs' request, therefore, is granted as necessary to make the plaintiffs whole. However, plaintiffs further request for the doubling of additional actual damages which have accrued since the return of the verdict will be denied. "[L]iquidated damages is in effect a substitution for punitive damages and is intended to deter intentional violations of the ADEA." *Kelly v. American Standard, Inc., supra*, 640 F.2d at 979. Further liquidated damages are here inappropriate because the delay in the judgment was caused by the necessity for the Court to

consider the equitable issues and is not the fault of defendant.

 *Kelly v. American Standard, Inc., supra*, 640 F.2d at 982, authorizes the award of prejudgment interest under the court's equitable powers under the ADEA, § 7(b), (§ 626(b)), because "the loss of use of this money [unpaid wages] during the period payments were withheld ... should be compensated by payment of interest." The court there approved application of the statutory interest rate under state law. *Id.* For this reason, plaintiffs shall recover prejudgment interest at the California statutory rate of seven percent. Cal.Const., Art. 15, § 1; Cal.Civ.Code § 1916–1. Prejudgment interest shall be payable only on actual damages, as herein adjusted, and shall not be subject to doubling under ADEA § 7(b), (§ 626(b)) and 29 U.S.C. § 216(b).

### Systemwide Relief

Plaintiffs, in their proposed judgment [Revised], request, in effect, systemwide relief; that is, that Western be enjoined generally from refusing to permit flight deck crew members from continuing to work as second officers after age 60. Defendant contends that such broad relief is inappropriate because this is not a class action and the only relief sought and necessary is with respect to these individual plaintiffs.

The ADEA incorporates the Fair Labor Standards Act's "opt-in" procedure. ADEA, § 7(b), (§ 626(b)); 29 U.S.C. § 216(b). Although this would appear to restrict the availability of class actions, at least for damages, in ADEA cases, *see Naton v. Bank of California*, 649 F.2d 691 at —— (9th Cir. 1981), a number of courts have approved class-wide injunctive relief in employment discrimination cases, despite the fact that no class had been certified under Rule 23, Fed.R.Civ.P. Thus, it was observed in *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 719 (7th Cir. 1969), that a Title VII suit is "necessarily" a class action "as the evil sought to be ended is discrimination on the basis of class characteristics...." For this reason, the interests of other members of that "class" are at stake, whether or not a class has been certified, "and the court has a special responsibility in the public interest to devise remedies which effectuate the policies of the Act as well as afford private relief to the individual employee instituting the complaint." *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1201 (7th Cir. 1971), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1972) (citations omitted). *See also, Brito v. Zia Co.*, 478 F.2d 1200, 1207 (10th Cir. 1973); *Aros v. McDonnell Douglas Corp.*, 348 F.Supp. 661, 663 (C.D.Cal.1972) (Ferguson, J.).

 Because the remedial purpose of both Title VII and the ADEA are the same, "elimination of discrimination from the workplace," *Lorillard v. Pons, supra*, 434 U.S. at 584, 98 S.Ct. at 872, and because the injunctive powers under both statutes are similarly broad, *compare*, ADEA, § 7(b), (§ 626(b)), *with* 42 U.S.C. § 2000e–5(g), I conclude that the same standards for class-wide relief should be applied in ADEA cases as are applicable under Title VII. I concur with the jury's finding that the violations here were willful. The retirements of plaintiffs Criswell and Starley and the threatened retirement of plaintiff Ron were pursuant to Western's policy to require all flight deck personnel, including second officers, to retire at age 60. Clear and willful violations of the ADEA having been established, a permanent injunction shall issue prohibiting any future violations directed to the same discrimination in the workplace.

### The Position of ALPA

 Belatedly, after verdict, Western renewed its contention that ALPA is an indispensible party and that its absence renders the trial a nullity. This is an action against Western as an "employer" under ADEA, § 4(a), (§ 623(a)), and no relief has been sought against or rendered affecting ALPA, as a "labor organization." ADEA, § 4(c), (§ 623(c)). No requirement under Rule 19, Fed.R.Civ.P., compelled joinder of ALPA in this action. This contention is wholly without merit.

The one area which might implicate the Pilot Agreement, and thus ALPA, is medical testing. Western contends that the Pilot Agreement prohibits its requiring a more stringent medical examination than required for an FAA second class airman's certificate. Plaintiffs contend, citing an Opinion Letter from the Wage and Hour Administrator, 2 Empl.Prac.Guide [CCH] ¶ 5114 (Oct. 30, 1978), that the ADEA prohibits a more stringent medical examination requirement for plaintiffs than for younger pilots.

Plaintiffs' case was largely based on their medical expert's opinion that appropriate, individualized medical procedures were now available. Thus, Western's BFOQ defense failed because, under the *Tamiami* test, *supra*, 531 F.2d at 235, (*see* footnote 7, *supra*), it failed to carry its burden of proof that dealing with age 60 second officers would not be practical on an individualized basis. It would be ironic if Western were now to be prohibited from such individualized examinations. Therefore, pending Western's renegotiation of the Pilot Agreement with ALPA, Western will be permitted under the decree to administer, at its expense, appropriate medical examinations, in addition to the second class airman's examination, to second officers age 60 and older. At the next labor negotiations with ALPA on the Pilot Agreement, Western will be free to bargain for the right to require such medical examinations as it thinks are necessary and appropriate in order to discharge its responsibility as a certified air carrier.

*Attorneys' Fees*

Plaintiffs, having prevailed at trial, are entitled to an award of reasonable attorneys' fees. ADEA, § 7(b), (§ 626(b)); 29 U.S.C. § 216(b); *Kelly v. American Standard, Inc., supra*, 640 F.2d at 986 & n.21. Plaintiffs shall file their application for reasonable attorneys' fees, including full and detailed back-up data, *Id.*, within 30 days hereof.