Gerry W. MONROE, et al., Plaintiffs,

and

Equal Employment Opportunity Commission, Plaintiff-Intervenor,

v.

UNITED AIR LINES, INC. and Air Line Pilots Association, International, Defendants.

Lee F. HIGMAN, et al., Plaintiffs,

and

Equal Employment Opportunity Commission, Plaintiff-Intervenor,

v.

UNITED AIR LINES, INC. and Air Line Pilots Association, International, Defendants.

Nos. 79 C 360, 79 C 1572.

United States District Court, N.D. Illinois, E.D.

Aug. 16, 1983.

---

Raymond C. Fay, Alan M. Serwer, Haley, Bader & Potts, Chicago, Ill., for plaintiffs.

Edward L. Foote, Winston & Strawn, Chicago, Ill., for defendant United.

Michael Abram, Jay P. Levy-Warren, Cohen, Weiss & Simon, New York City, Michael B. Erp, Katz, Friedman, Schur & Eagle, Chicago, Ill., for defendant ALPA.

## MEMORANDUM

SHADUR, District Judge.

On September 29, 1982 this Court entered judgments on the original jury verdicts in favor of the individual plaintiffs and against United Air Lines, Inc. ("United"). On October 26 this Court (1) amended those judgments by entering judgments for dou-

ble damages, based on the jury's special interrogatory answer finding United's violation of the Age Discrimination in Employment Act ("ADEA") to have been willful, and (2) deferred its ruling on the remaining equitable issues pending further submissions by the litigants. This Court's January 12, 1983 memorandum opinion and order at 2 n. 2 identified further factual input required from the parties on the complex equitable issue of pension benefits. This Court has received and reviewed the various submissions by the parties,[1] and it is now prepared to assess the parties' arguments and positions.

### United's Retirement Plans

United administers two pilot pension plans: the Pilots' Fixed Benefit Retirement Income Plan (the "Fixed Plan") and the Pilots' Variable Benefit Retirement Income Plan (the "Variable Plan"). By a June 24, 1982 Supplemental Agreement (the "Supplemental Agreement") United and Air Line Pilots Association, International ("ALPA") agreed (¶ B.2) to convert the Variable Plan into a Pilots' Directed Account Retirement Income Plan (the "Directed Account Plan"), effective retroactively to February 1, 1981.[2] Supplemental Agreement ¶ B.3 allowed pilots whose "retirement date" was February 1, 1981 or later to elect to have the Directed Account Plan applied to them.[3]

---

1. Plaintiffs have submitted:
   1. an October 22, 1982 Preliminary Statement on Treatment of Pension Benefits ("Pl. Oct. Mem.");
   2. a February 11, 1983 Memorandum on Treatment of Pension Benefits ("Pl. Feb. Mem.");
   3. a February 28, 1983 Supplement to Plaintiffs' Memorandum on Treatment of Pension Benefits ("Pl. Feb. Supp. Mem.");
   4. an April 11, 1983 Further Supplement to Plaintiffs' Memorandum on Treatment of Pension Benefits ("Pl. Apr. Supp. Mem."); and
   5. a May 9, 1983 Reply Memorandum on Treatment of Pension Benefits ("Pl. R. Mem.").

On April 20, 1983 both ALPA ("ALPA Ans. Mem.") and United ("United Ans. Mem.") also filed memoranda.

2. Supplemental Agreement ¶ A defines "active pilot participant" in United's Plans to mean a pilot on active status, on sick or medical-disabled leave or on leave of absence for ALPA business. Thus the change effected by Paragraph B.2 impacted on pilots who were on "active" status (or in other ways not retired) as of February 1, 1981.

3. Because the "normal retirement date" under the Plans is "the first day of the calendar month next following [a pilot's] 60th birthday" (Fixed Plan § 3.1), Supplemental Agreement Paragraph B.2 affected pilots who reached age 60 January 1, 1981 or thereafter. Election of the Directed Account Plan was apparently universal. Pl. Feb. Mem. 2 n. **.

Under Fixed Plan § 5.1 as amended by Supplemental Agreement ¶ B.1, normal monthly retirement income is one-twelfth of the following formula: 1.39% × years of participation × Final Average Earnings ("FAE"). Generally "years of participation" are now years in which a pilot had earnings under the current Fixed Plan, though years of participation were once measured by periods in which contributions were made by participants. FAE generally are the highest annual average earnings in a consecutive 36-month period during the last 120-month period in which there were earnings. Pl.Feb.Mem. 5–6.

With one exception the Fixed Plan freezes benefits at age 60. Under that exception, if a pilot participant continues in United's employ beyond age 60 in (say) a management capacity, his accrued benefit under the Fixed Plan is subject to an actuarial increase reflecting the date of his ultimate retirement. Fixed Plan §§ 4.4, 5.1(b)(ii).

Under the Variable Plan normal retirement income is one-twelfth of the number of "Benefit Units" multiplied by the "Applicable Unit Value" for that month. United contributes 11% of annual earnings before age 60. No issue is made by the parties as to the method of calculating the number of Benefit Units and the Unit Value. However, in contrast to treatment of the matter under the Fixed Plan, under the Variable Plan retirement income is actuarially increased when retirement occurs beyond the normal retirement date. Pl.Feb.Mem. 8.

Under the Directed Account Plan each pilot's Variable Plan account is converted into its cash equivalent and may be directed in 10% increments among three investment funds. United's contribution, now made directly to each pilot's account, is reduced from 11% of earnings to 9%. Any pilot electing the Directed Account Plan may also elect to receive his retirement benefit under that Plan in one of various forms in addition to a single life annuity. *Id.* at 8.

Only one further item need now be noted. Under Supplemental Agreement ¶ D, payments under both the Fixed Plan and the Directed Account Plan are suspended for a pilot who is "reemployed by the Company at any time after his monthly benefit payments have commenced."

*Plaintiffs' Proposals*

Plaintiffs propose they be granted a menu of options (Pl. Oct. Mem. 1–4) as to their retirement income:

A.  Fixed Plan:

1.  Plaintiffs who have reached age 60 and who were reinstated would choose between (a) continued retirement payments during the period of reinstatement at the age-60 benefit level and (b) reinstatement as an active participant in the Fixed Plan, with no benefits payable during the period of reinstatement. Ultimate benefits under option (b) would be calculated either by (1) increasing the age-60 benefit level actuarially to reflect the date of ultimate retirement or (2) crediting the participant for his additional service under the ordinary retirement formula in the Fixed Plan.

2.  Plaintiffs who have reached age 60 and who were not reinstated would choose between the Fixed Plan options in subparagraph 1(b), with the date of judgment considered the date of ultimate retirement and with employment deemed continuous to that date.

3.  Plaintiffs who have not reached age 60 would continue as active participants in the Fixed Plan beyond age 60 and would receive benefits at the time of retirement at one of the two benefit levels specified in subparagraph 1(b).

B.  Variable and Directed Account Plans:

1.  Plaintiffs who have reached age 60 and who were reinstated would choose under the Variable Plan or the Directed Account Plan either (a) continued receipt of their retirement benefits for life at the age-60 level or (b) reinstatement in the Plan as an active participant, with full credit for service and company contributions after age 60 to either (1) the date of ultimate retirement (when they would

make any election of benefits permitted under the Directed Account Plan) or (2) any other future date before ultimate retirement (when again they would make any election of benefits permitted under the Directed Account Plan).

2. Plaintiffs who have reached age 60 and were not reinstated would choose under the Variable Plan or the Directed Account Plan either (a) receipt of benefits at a new level based on the age-60 benefit level actuarially increased from age 60 to the date of judgment or (b) election from among the benefit options under the Directed Account Plan as of the date of judgment, with full credit for service and company contributions from age 60 to the date of judgment.

3. Plaintiffs who have not reached age 60 would continue as active participants under the Directed Account Plan beyond age 60 and would be given full credit for service and company contributions from age 60 to the date of retirement, exercising the benefit options set forth in the Directed Account Plan effective on the date of their choosing after the normal retirement date of age 60.

Appropriate adjustments for all plaintiffs would be made to pension accounts and damage awards depending upon the option chosen, with interest assumptions and adjustments made accordingly.

In principal part the disputes between the parties concern (1) the possibility of receipt of pension benefits during the period of reinstatement and "reemployment" and (2) the prospect of increasing ultimate retirement benefits on the basis either of actuarial tables or post-60 employment services. Though a superficial look might disfavor either or both those forms of relief in equitable terms, on analysis (and somewhat surprisingly perhaps) the first possibility turns out to be both equitable and more defensible than the full scope of the latter prospect. That conclusion follows from what ALPA accurately characterizes (Ans.Mem. 5) as the guiding equitable principle: "[P]laintiffs should be placed in approximately the same position from the standpoint of retirement benefits that they would have been in if they had not been required to retire."

### Viewing the Issue as a Matter of United's Costs

These pension-related questions are equitable in the classic and literal sense: What form of relief best represents justice as between the parties? For that reason it is instructive to begin analysis by looking at the issue from the perspective of United's costs, without reference for the time being either to the collective bargaining agreements between United and ALPA or to the governing law. Of course the only relevant costs here are United's salary payments to its personnel and its contributions to the Fixed Plan and the Variable Plan (or the Directed Account Plan), so the matter may be discussed in somewhat simplified form.

Obviously all amounts earned before age 60 in either salary or potential pension benefits have been for *past* service. That fact underlies the concept of vested and nonforfeitable benefits. Thus, as plaintiffs note (Pl. Feb. Mem. 10) continuation of retirement benefits at the age-60 level during reinstatement actually represents no additional costs to United. It is irrelevant that younger employees who have vested retirement benefits cannot receive *early* retirement benefits under the Fixed Plan (see ALPA Ans.Mem. 7). Every pilot reaching the normal retirement age of 60 has earned Fixed Plan benefits that United expects to pay out and will in fact pay out if the pilot does in fact retire.

Consider then post-age-60 services of pilots who elect to continue working. If an individual pilot simply loses a year's payout from the Fixed Plan, it might at first appear the overall pension cost to United is the same because the saving is to the Plan and not to United (which pays the same salary to the under-60 and over-60 Second Officer). But that really is not so, for United (responsible for funding the Plan and for its actuarial soundness) now in effect has an overfunded Plan, and its required future contributions are lessened pro

tanto. For instance if the unpaid Fixed Plan benefit were $35,000 yearly, United would get a pilot's post-60 service as Second Officer for an overall annual effective cost of say $45,000 rather than $80,000, and United would therefore reap a windfall.[4] On the other side of the same coin, the pilot would be paid partly with money he has already earned in past years (remember contributed funds belong to the Plan, whose beneficiaries are the pilots, and *not* to United).

So continuing pension benefits during a reinstatement period is not as odd as it first seems. That sense of oddness stems from our appreciation of the basic concept of a retirement plan: It is created to provide for retirement, not to provide supplemental income. Yet if a retired United pilot went to work for another airline or for industry in a flight engineer job, he would get both his United pension and his new (and presumably equivalent) salary, because he would have earned the one and would now be earning the other. And once the notion of continued pension payments is accepted, of course, it is conceptually permissible to allow a reinstated pilot to elect not to receive continued pension payments during his employment but rather to receive (1) a present lump-sum equivalent distribution or (2) the actuarial equivalent of his age-60 level monthly payment at some later date.

Exactly the same analysis would apply under the Variable Plan or the Directed Account Plan as to pre-age-60 services, contributions and earnings. It simply does not alter either United's or its employees' expectations if a pilot reaching age 60 collects the *benefits* that have *accrued* to him from his pre-age-60 services.

But the matter is conceptually different as to post-age-60 *contributions* to the Plans. True enough, United derives some savings in cost as to such an employee for whom it need not make pension-related contributions—for it must make such contributions for every flight officer *under* age 60. But United and ALPA have made age 60 the "normal retirement date," and that determination does not violate ADEA in and of itself.[5] As for the Fixed Plan formula, originally adopted in contemplation of uniform retirements at age 60, it presumably provides reasonable post-service income at that age. When fewer years of life expectancy need to be funded because of a later commencement of retirement benefits, an actuarial increase in the annuity paid under the Plan tends to counter the effect of diminished purchasing power in case of inflation.

Thus there is no economic *need* to compel either (1) continued service accruals or (2) continued contributions from United under that Plan. Although United does get somewhat cheaper services, neither its nor its employees' expectations are disrupted by terminating service accruals or employer contributions at the normal retirement date of 60.

Again the same analysis would be applicable under the Variable Plan or the Directed Account Plan. United has lower employment costs associated with the 61-year-old Second Officer than with the 59-year-

---

**4.** We must always remember, throughout consideration of these questions, a pension plan is not just another pocket of the employer into which the employer has placed some funds for the time being. Such plans are separate entities holding separate funds to which an employer has no right (except under extraordinary circumstances following plan terminations), a concept reinforced by Internal Revenue Code restrictions and more recently by ERISA. In the text example, United's salary payment of $80,000 to the Second Officer would carry with it a $35,000 saving to United in the future Fixed Plan contributions required to preserve the Plan's actuarial integrity.

**5.** ADEA as amended prohibits compelling actual retirement under age 70. 29 U.S.C. § 631(a). Neither that amendment nor ADEA in its original form inhibits the establishment of an earlier "normal" retirement age—a concept that necessarily carries potential benefits that make pre-age-70 retirement more attractive. Obviously some differences in treatment might make early retirement so attractive, or continued employment past the "normal" retirement date so onerous in comparison, as to generate the real world equivalent of mandatory retirement at that "normal" date. This case does not require a decision as to whether and where such a cutting edge might be found.

old, because it makes no Plan contributions for the former. Nevertheless post-age-60 payments by United to the Plans would not be required from the point of view of the flight officers' prior economic expectations. Whether they might be required by law is a matter discussed below.

At the risk of laboring what has seemed obvious to this Court but has not (at least overtly) informed the parties' analysis, the distinction already made may be restated this way:

    1. When an employee reaches normal retirement age, his vested benefits under a pension plan will fund a certain level of benefits (say in the form of a post-retirement annuity). If he continues working and (a) his receipt of benefits is deferred until he retires in fact and (b) his benefit level is frozen at the normal-retirement-age figure, he has been correspondingly deprived of a portion of the already-vested amount. From another perspective, the new money he receives for his new services is really only the difference between his nominal salary and the annuity he would have received. If an adjustment to prevent the loss of vested values is appropriate, however, it might take the form of payment of the annuity even while working past the normal date, or an actuarially increased annuity beginning on the actual date of retirement, or perhaps some other means.

    2. Continued vesting to reflect credited service after the normal retirement age has different economic consequences. It would require added employer contributions to fund any such increased vesting (and the corresponding increased benefits). But the employer's failure to make such future contributions would not *divest* the employee of benefits he had already earned by rendering services before reaching normal retirement age. It is true such failure would place a lower value (via a lower cost) on post-60 services than on pre-60 services, but the real

inequity of forfeiture of vested benefits would not be involved.

This restatement reflects no value judgment as to what the law requires in these areas. Rather it poses the matter in terms of the equities, to be considered later in looking at any law that does bear on the issues. Before that subject is explored, however, a brief look at the Supplemental Agreement ¶ D is warranted in view of what has already been said.

*Effect of Supplemental Agreement ¶ D*

Ordinarily a court ought to let the free market operate and therefore ought to defer to negotiations between an employer and an employee on a subject like pension benefits. But as this Court has previously observed, although ALPA is theoretically responsible for all its constituency it has in this case consistently elected to be faithless to the interests of the plaintiffs and others approaching 60.[6] In that light Supplemental Agreement ¶ D, which suspends Fixed Plan and Directed Account Plan payments to pilots "reemployed" by United after they had begun receiving such benefits, is a punitive provision and not one fairly negotiated between parties seeking to advance their own respective interests and then reaching an accommodation of those interests. As the analysis above suggests, continued pension payments during the period of reinstatement cost United nothing more than it contemplated paying all along (indeed to the extent it obtains post-60 services without having to provide ongoing funding, United benefits). On the other side of the coin, the employee who receives a salary but loses vested benefits is correspondingly undercompensated for his services.

Apparently the Plans were silent on the subject before the Supplemental Agreement, and that fact further suggests the true intent of Supplemental Agreement ¶ D. Indeed insofar as the Fixed Plan did previously deal with the problem of a retired pilot continuing on United's payroll,

---

**6.** Most recently, see this Court's August 12, 1983 opinion dealing with the recently-negotiat- ed United-ALPA Letter of Agreement.

it specifically awarded such a "late" retiree actuarially increased pension benefits (Fixed Plan §§ 4.4, 5.1(b)(ii))—again the economic equivalent of the same employee's receiving continued age-60 level pension payments during the period of his continued employment. That was what arms-length negotiations produced before ALPA chose to apply its divided loyalty to the detriment of plaintiffs and in favor of the far more numerous younger flight officers. As such it is the best available evidence of what undistorted arms-length negotiation (and the equities) call for here. This Court therefore disapproves Supplemental Agreement ¶ D.

### Effect of the Law

Just how the applicable law impacts on this entire analysis is rather puzzling. Neither side suggests the 1967 legislative history of ADEA indicates one way or another whether benefit accruals and contributions may be lawfully ceased or even cut back after the normal retirement age provided in a plan. Rather they argue (Pl. Feb. Mem. 15–20; ALPA Ans.Mem. 1–4; United Ans. Mem. 2–4) over the implications of assurances, given when ADEA was amended in 1978, that employers would not be required to make pension plan contributions for employees working beyond age 65, newly protected under those ADEA amendments.[7] They differ over whether those assurances are applicable or inapplicable where, as here, the normal retirement age is in any case below age 65.

**7.** Though the cited legislative history refers in passing to the question of actuarial equivalents in case the employee works past normal retirement, substantially its entire focus is on the problem just described in the text—the second rather than the first issue discussed at the end of this opinion's section headed "Viewing the Issue as a Matter of United's Costs."

**8.** United (Ans. Mem. 7–10) says the Variable Plan is not really "supplemental," but plaintiffs (R.Mem. 4) quote Labor Department regulations that, taken at face value, preclude United's attempt to portray its Plans as one whole.

**9.** ALPA (Ans.Mem. 11–12 and Ex. A) cites a Consent Decree in a substantively identical ADEA action against Northwest Airlines that provides for (1) suspension of retirement bene-

Department of Labor interpretations reach a conclusion that—at least in the circumstances of this case—this Court's cost analysis would suggest is not really defensible. Those regulations generally permit an employer to freeze benefits at the "normal retirement age" level under a "defined benefit plan" such as the Fixed Plan, without either benefit accruals, service credits or actuarial increases. But those same regulations and interpretations thereunder require employer contributions to continue beyond the normal retirement age under any "defined contribution plan" such as United's Variable Plan. Pl. Feb. Mem. 3–4. That result is explained by characterizing such a plan as "supplemental" to the defined benefit plan.[8]

That distinction really does not make much sense, unless the Department's purpose were to lower (but not by too much) an employer's cost of compensating an employee who works beyond the designated normal retirement date. No one has identified any real justification in the legislative language (or even the legislative history) for such uneven treatment.

Nor does any of the other source material adduced by the parties cast much (if any) light on the issues. Certainly negotiated settlements in similar ADEA actions are of little aid,[9] and existing case law is sparse and does not focus in any meaningful way on the economic analysis here regarded as necessary.[10]

fits during reinstatement and (2) eventual monthly retirement income at the age-60 level without actuarial or service-accrual adjustment. United (Ans. Mem. 3 and App.) cites the same case's Settlement Agreement. Yet a negotiated settlement between the parties in another action cannot possibly *define* what equity demands here. Not surprisingly, plaintiffs too cite settlement agreements to their liking. Feb. Mem. 10 n. *.

**10.** In *Criswell v. Western Air Lines, Inc.,* 514 F.Supp. 384, 394–95 (C.D.Cal.1981), the district court approved (1) fixed plan pension payments to reinstated pilots and (2) continued contributions and service accruals under a variable plan. Those rulings were evidently not appealed, and so *Criswell's* recent affirmance,

*What the Equities Require*

It must be remembered what this case involves is an adjudicated violator of ADEA, compelled by law to cure that violation by permitting its age-60 employees to continue working. Maybe the law would permit an employer without such a history of major ADEA violations to structure its retirement plans to give persons retiring after the "normal" date less in economic terms than those retiring at the "normal" date—even though the legal evidence on the permissibility of such treatment may be thin. But this Court sees no warrant for an employer in United's position to gain a *windfall* by obtaining cheaper services via the use of its pension plans (never created for such a purpose). Whatever ERISA might arguably *permit* in that respect, surely it does not *mandate* that result. And if ERISA does not mandate the result, this Court is not about to do so.

Accordingly this Court exercises its equitable powers to grant each of the options and benefits proposed by plaintiffs and described in the "Plaintiffs' Proposals" section of this opinion:

(1) in all the numbered paragraphs under "Fixed Plan" (except to the extent those options would permit employees to elect continued service credits after age 60) and

(2) in numbered paragraphs 1 and 2 under "Variable and Directed Account Plans" (except to the extent of requiring continued service credits and contributions after age 60).

None of those options and benefits increases United's pension costs as they existed before it lost this case, and United can scarcely complain about not being permit-

ted to take advantage of its unlawful conduct to *decrease* its costs.

What of the rest of plaintiffs' proposals, those calling for post-60 service credits and contributions? By definition they have no counterpart in the present Plans, and as the earlier discussion illustrates this Court does not view them as having the same call on a chancellor's equitable conscience as the options and benefits referred to in the preceding paragraph.

As to the Fixed Plan proposals, that lack of equity is dispositive for this Court—it will deny such new credits and contributions. But as to the Variable and Directed Account Plans, we must confront administrative regulations that define such credits and contributions to be mandated by *law.* For this Court to reject that aspect of plaintiffs' proposals would require it to invalidate those regulations.[11] And United's presentation supporting such a result ˈ(United Ans.Mem. 10–13) is not compelling.

Accordingly this Court also grants the balance of plaintiffs' proposals except for the Fixed Plan options as to post-60 service credits, not because such proposals are compelled as a matter of equity but because they are compelled by law (that is, administrative regulations having the force of law). That completes the menu nearly to plaintiffs' taste, albeit for different reasons.

*Conclusion*

All the options and benefits proposed by plaintiffs must be accorded them, with the exception referred to in the preceding paragraph. United and ALPA are ordered promptly to prepare and execute such documents affecting changes in the Fixed Plan, the Variable Plan and the Directed Account Plan as are necessary to provide such options and benefits.[12]

709 F.2d 544 (9th Cir.1983), provided no additional authority on point. Similarly, *Thurston* does not discuss the pension issues involved here.

**11.** As this opinion has previously noted, the same regulations would *permit* employers to freeze benefits under pension plans like the Fixed Plan. But they do not *require* such freezing, so this Court's denial of that right to United on wholly equitable grounds, because of the

special circumstances here, in no way implicates an invalidation of the regulations' grant of permission to employers generally.

**12.** One directly-related subject must also be taken into account: the fact pension payments were given effect (pursuant to this Court's ruling) in the damages figures submitted to the jury. At that time this Court also ruled appropriate adjustment would be made in the equitable relief if the ultimate conclusion as to the

treatment of pensions were different. That has now come about, and the parties should ad-

dress the relevant calculations with equal promptness.