John H. BAKER; Jack P. Chambers; J. Jess Huerta; William T. McMullen; Thomas B. Ryan; Howard W. Stokes; Paul L. Stunz, Plaintiffs–Appellants–Cross–Appellees,

v.

DELTA AIR LINES, INC., Defendant–Appellee–Cross–Appellant,

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff–Intervenor–Appellant–Cross–Appellee.

John H. BAKER, Plaintiff,

Equal Employment Opportunity Commission, Plaintiff–Intervenor–Appellant,

v.

DELTA AIR LINES, INC., Defendant–Appellee.

John H. BAKER; Jack P. Chambers; J. Jess Huerta; William T. McMullen, Plaintiffs–Appellees–Cross–Appellants,

Alvin C. Oppenheim, Plaintiff–Cross–Appellee,

v.

DELTA AIR LINES, INC., Defendant–Appellant–Cross–Appellee,

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff–Intervenor–Appellee–Cross–Appellant.

Nos. 92–55044, 92–55048 and 92–55049.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1993.

Decided Sept. 30, 1993.

As Amended on Denial of Rehearing and Suggestion for Rehearing En Banc Dec. 9, 1993.

Alan M. Serwer, Bell, Boyd & Lloyd, Chicago, IL, for plaintiffs-appellants-cross-appellees.

Paula R. Bruner, E.E.O.C., Washington, DC, for plaintiff-intervenor-appellant-cross-appellee.

William H. Boice, Kilpatrick & Cody, Atlanta, GA, for defendant-appellee-cross-appellant.

Before: BROWNING, BOOCHEVER and THOMPSON, Circuit Judges.

BOOCHEVER, Circuit Judge:

This appeal presents the question whether Delta Air Lines, Inc. ("Delta") is bound as a successor by an injunction prohibiting Western Air Lines, Inc. ("Western") from preventing pilots age 60 and older from downbidding two steps to the position of second officer or flight engineer. Also at issue is whether various exhibits were admissible at trial and whether Delta was entitled to judgment as a matter of law on the claim that it willfully violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34 (1988). We hold that Delta is bound by the injunction against Western, that the district court erred in excluding certain plaintiffs' exhibits, and that, as a matter of law, Delta did not willfully violate the ADEA. Accordingly, we reverse the district court in part and remand for a new trial, except for the claim of Alvin C. Oppenheim.

## BACKGROUND

The Federal Aviation Administration ("FAA") requires that captains and first officers who pilot commercial air carriers be less than 60 years old. 14 C.F.R. § 121.383(c). The captain is the pilot in command of the aircraft and is responsible for all phases of its operation. The first officer functions as

copilot and assists the captain. The FAA rule does not apply to second officers, also known as flight engineers. The second officer monitors the instrument panel and does not fly the plane unless both the captain and the first officer are incapacitated. Some captains disqualified by the FAA's age limitation have tried to continue their employment with commercial airlines by seeking positions as second officers. This process is known as "two-step downbidding."

### A. *Prior Litigation against Western Airlines.*

Delta acquired Western Airlines, Inc. ("Western"), a commercial airline, as a wholly-owned subsidiary in September 1986 under a plan of merger. Before its acquisition by Delta, Western had a policy prohibiting two-step downbidding. In 1981, captains who sought to downbid to the second officer position upon reaching age 60 sued Western, claiming that its policy violated the ADEA. The jury found that Western had violated the ADEA, *Criswell v. Western Air Lines, Inc.,* 514 F.Supp. 384 (C.D.Cal.1981), *aff'd,* 709 F.2d 544 (9th Cir.1983) (*"Criswell I"*), *aff'd on other grounds, Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985), and the district court issued the following system-wide permanent injunction:

> Western, its officers, agents, servants, employees, and attorneys and all persons in active concert or participation with it who receive actual notice of this Final Judgment and Permanent Injunction and Western's successors and assigns, are hereby permanently enjoined from:
>
> (a) Refusing or failing to permit its flight deck crew members to work or continue to work as second officers after age 60 for any reason based on age.
>
> (b) Refusing or failing to consider or act favorably upon downbids by captains or first officers for second officer positions for any reason based on age.
>
> . . . .

The Western–Delta merger was consummated on April 1, 1987, when Western ceased to exist. In the early months of 1987 before the consummation of the merger, Delta advised certain Western captains who were approaching age 60 and who sought to continue their employment as second officers that it would not permit them to serve in any cockpit position after age 60. In March 1987, Charles Criswell and fourteen other Western cockpit crewmembers who were then over age 60 and were serving or training to serve as second officers moved for a citation of contempt against Delta for failure to comply, as a successor to Western, with the *Criswell I* injunction. The district court found Delta to be a successor to Western and prohibited Delta from preventing the plaintiffs from serving as second officers pursuant to the *Criswell I* injunction. *Criswell v. Delta Air Lines, Inc.,* No. CV–78–2184–AWT (C.D.Cal. March 30, 1987), *aff'd,* 868 F.2d 1093 (9th Cir.) (*"Criswell II"*), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989). The district court's order stated:

> Delta is a successor to Western and is bound by the *Criswell* injunction . . . with respect to the employment of plaintiff and movants. It appears to the Court that Western's and Delta's flight operations will not be fully integrated until some time in the future. At this point, then, Delta is a successor for the purposes of the pending motion. The Order is limited to these 15 individuals who are being permitted to continue their employment as Second Officers, and does not apply to those who in the future may seek to transfer, or "down bid" from Captain to Second Officer at age 60 or to serve as Second Officer after age 60.

### B. *Appellants Baker and Stunz.*[1]

Appellants Baker and Stunz, both former Western captains, turned 60 years old in December 1986 and January 1987, respectively. Baker and Stunz petitioned Western to allow them to downbid to second officer positions, and Western granted their re-

---

1. The EEOC intervened on behalf of all plaintiffs in this case on September 22, 1989, approximately nine months before trial.

quests. Both were transferred to second officer positions upon reaching their sixtieth birthdays. Stunz began training for the position while Baker awaited scheduling of his training. Neither was a party to the *Criswell II* litigation.

Delta informed Baker and Stunz on February 13, 1987, that they would be ineligible to continue employment with Delta as second officers. Delta stated that two company policies prevented their employment as second officers. One prohibited anyone aged 60 or older from serving in a cockpit position ("age–60 rule"). The other prohibited all captains, regardless of age, from two-step downbidding ("two-step downbidding rule"). Delta explained that these policies were based on safety considerations and had been found lawful in federal court.

Baker and Stunz filed suit against Delta in federal district court in January 1989. They alleged that Delta, as a successor to Western, was required to employ them as second officers pursuant to the *Criswell I* injunction. Baker and Stunz moved for partial summary judgment against Delta arguing (1) that collateral estoppel precluded Delta from re-litigating the successorship issue decided in *Criswell II* and, alternatively, (2) that even if the court were to consider the issue anew, Delta was obligated under the successorship doctrine to permit them to serve as second officers. The district court denied the motion without written opinion. Concluding that the issue was purely one of law, the district court bifurcated the issue from those that went to the jury. The court again rejected Baker and Stunz's successorship claim after the trial.

Baker and Stunz appeal the district court's denial of their partial summary judgment motion. They apparently have abandoned their collateral estoppel argument, so that only the merits of their successorship liability claim are before this court.

### C. *Appellants Chambers, Huerta, McMullen, Ryan, and Stokes.*

Baker and Stunz were joined by Appellants Chambers, Huerta, McMullen, Ryan, and Stokes ("the Chambers Appellants") in making the additional claim that Delta's poli-cies violate the ADEA. The jury returned a verdict for Delta. The Chambers Appellants are similar to Baker and Stunz in that they are all former Western captains who sought but were denied employment by Delta as second officers upon reaching age 60. They are distinguishable from Baker and Stunz, however, in that they failed to reach their sixtieth birthdays until after the April 1, 1987, effective merger date. Therefore they served as Western captains until April 1, 1987, when they were employed as Delta captains until their sixtieth birthdays.

Like Baker and Stunz, the Chambers Appellants asserted and lost the successorship liability claim in the district court. They do not, however, appeal that decision. Rather, they join Baker and Stunz in appealing the jury verdict against them on the claim that Delta's two-step downbidding rule violates the ADEA. Appellants argue that the district court committed reversible error by excluding certain plaintiffs' exhibits and admitting a certain defense exhibit.

### D. *Cross–Appellant Delta and Cross–Appellee Oppenheim.*

Cross–Appellee Oppenheim was employed by Delta as a second officer for 31 years. When Oppenheim reached his sixtieth birthday on April 4, 1988, Delta prohibited him from continuing in that position, citing its age–60 rule. Oppenheim challenged this rule as a violation of the ADEA and claimed that the violation was willful. The jury returned a verdict for Oppenheim, finding that Delta had willfully violated the ADEA.

Delta does not appeal the conclusion that its age–60 rule violates the ADEA, but it does challenge the jury's finding that the violation was willful. Delta argues that it was entitled to a directed verdict on the willfulness claim because a jury's finding that its age–60 rule is lawful had been affirmed in a previous Eleventh Circuit opinion. *See Iervolino v. Delta Air Lines, Inc.,* 796 F.2d 1408 (11th Cir.1986), *cert. denied,* 479 U.S. 1090, 107 S.Ct. 1300, 94 L.Ed.2d 155 (1987).

### DISCUSSION

### I. *Successorship Liability.*

■ Baker and Stunz assert that they were entitled to summary judgment on their

claim that Delta was bound by the *Criswell I* injunction as a successor to Western. "In an employment discrimination action, there are three principal factors relating to successor liability:

> (1) continuity in operations and work force of the successor and predecessor employers;
>
> (2) notice to the successor employer of its predecessor's legal obligation; and
>
> (3) ability of the predecessor to provide adequate relief directly."

*Criswell II*, 868 F.2d at 1094. Successorship liability is an equitable doctrine so that fairness is a prime consideration. *Id.* Accordingly, the emphasis is on the second and third factors. *Id.* Only the first factor, however, is at issue on this appeal.

Baker and Stunz argue that because their cause of action is equivalent to that of the movants in *Criswell II*, the doctrine of stare decisis obliges us to hold Delta liable as a successor. Delta responds that *Criswell II* does not control because (1) the doctrine of stare decisis was not asserted in the district court; (2) the relevant date for assessing Baker and Stunz's successorship liability claim followed the Western–Delta merger, unlike in *Criswell II*, so that the prerequisite of continuity was not satisfied; and (3) unlike the *Criswell II* movants, Baker and Stunz were not serving as second officers and did not actively seek to continue as Delta second officers.

At the outset the parties dispute the standard of review on the successorship liability claim. Baker and Stunz argue that their appeal turns on issues of law which are reviewed de novo. Delta contends that the issue is whether the district court erred in exercising its equitable powers, which is reviewed for an abuse of discretion.

■ The parties confuse the standard for reviewing the merits of an issue and the standards for reviewing the procedural impact of an issue once the merits have been decided. Whether stare decisis applies and on what date a court is to assess a successorship claim are issues of law, reviewable de novo. *See United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert.*

*denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Whether Baker and Stunz were serving as second officers and/or actively pursuing second officer positions are questions of fact, reviewed for clear error. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Whether, based on the resolution of these issues, the district court erroneously failed to find Delta liable as a successor to Western is reviewed for an abuse of discretion. *Diaz v. San Jose Unified Sch. Dist.*, 861 F.2d 591, 595 (9th Cir. 1988) (abuse of discretion governs review of equitable remedies). Whether, depending on the resolution of the successorship liability issue, the district court erroneously denied Baker and Stunz's motion for partial summary judgment is reviewed de novo. *Mukherjee v. I.N.S.*, 793 F.2d 1006, 1008 (9th Cir.1986).

We are " 'bound by decisions of prior panels' unless an en banc decision, Supreme Court decision, or subsequent legislation undermines those decisions." *Clow v. U.S. Dep't of Housing and Urban Dev.*, 948 F.2d 614, 616 n. 2 (9th Cir.1991) (per curiam) (quoting *United States v. Washington*, 872 F.2d 874, 880 (9th Cir.1989)). We need not decide whether stare decisis is an argument that a party must assert at trial for it to be appealable because Baker and Stunz repeatedly asserted in the district court that *Criswell II* controlled their successorship claim.

In *Criswell II* we determined that all of the requirements for finding successorship liability were satisfied. First, there was ample evidence of continuity between Delta and Western because "during the post-merger period in question, the former Western flight operations were not integrated into Delta operations. Former Western personnel continued to fly former Western equipment on former Western routes, while Delta's pre-merger operations continued substantially unchanged." *Criswell II*, 868 F.2d at 1095. Second, "Delta was on notice of Western's legal obligation; it filed an amicus brief in support of Western in [*Criswell I*]." *Id.* Third, Western could no longer provide the injunctive relief because it no longer existed

as a corporate entity, whereas Delta could provide relief simply by retaining the movants as second officers. *Id.*

■ Assuming *arguendo* that the factors guiding our decision in *Criswell II* are identical in the claim now before us, *Criswell II* does not necessarily control this case because the procedural profiles differ. In *Criswell II* we reviewed whether the district court erred in finding that Delta was a successor to Western for purposes of applying the *Criswell I* injunction. *Criswell II,* 868 F.2d at 1094. In this case we review whether the district court erred in finding that Delta was *not* a successor to Western for injunctive purposes. Thus, to the extent that we defer to the district court's judgment, the cases are not identical. *Criswell II* is, however, strong persuasive authority on the successorship question.

Baker and Stunz maintain that their case is equivalent to that of Glen Shannon, Ernest Ellis, and Peter Hoffman, three of the *Criswell II* litigants. Shannon reached age 60 on February 4, 1987; Ellis on March 6, 1987; and Hoffman on March 24, 1987. As it did with Baker and Stunz, Western granted Shannon, Ellis, and Hoffman's bids to serve as second officers and told them that they would be trained for the position. Baker and Stunz argue that the analysis in *Criswell II,* particularly regarding the continuity between Delta and Western, applies with equal force to this case. We agree.

Delta asserts that *Criswell II* is distinguishable because Baker and Stunz were not actually serving as second officers and were not actively pursuing that position when Delta informed them that they were ineligible. Neither Shannon, Ellis, nor Hoffman, however, actually served as second officers. Each, like Baker and Stunz, awaited training when he was told Delta would not employ him in that position. Moreover, contrary to Delta's assertions, it appears that Baker and Stunz pursued the second officer position with Delta both before and after they were advised that they would not qualify for the position.

■ Delta also argues that this case is distinguishable from *Criswell II* because Baker and Stunz waited to file their claim until well after the April 1, 1987 effective date of the merger. According to Delta, this is . significant because a court evaluates whether one company is a successor to another on the date the successorship suit is filed. Delta contends that in January 1989, when Baker and Stunz filed suit, the continuity requirement for successor liability was not satisfied. Baker and Stunz, on the other hand, maintain that the relevant date for determining successorship was the date on which the cause of action arose.

Delta offers no authority for the proposition that successorship is determined on the date an action is filed, and we have found no cases directly addressing the question. Furthermore, *Criswell II* does not dispose of the issue since both the denial of employment to the 60–year–old plaintiffs and the filing of the successorship claim occurred prior to April 1, 1987, the effective date of the merger. We find Delta's argument illogical, however, and reject it. Generally, courts evaluate whether a defendant is liable according to circumstances existing on the day on which the cause of action accrued. If we accepted Delta's argument that we should evaluate liability according to circumstances existing on the date a suit is filed, then no party could recover damages for a past injury or secure an injunction against future harm based on a past injury unless the party filed its claim on the same date the injury occurred.

■ Baker and Stunz's cause of action was not rendered moot when Delta consummated its merger with Western in April 1987 because Baker and Stunz continue to suffer the effects of the alleged violation. Therefore, we hold that a successorship claim is to be evaluated, as are other claims, according to circumstances on the day on which the cause of action accrued. *See Bates v. Pacific Maritime Ass'n,* 744 F.2d 705, 708–10 (9th Cir. 1984) (successorship liability based on consent decree analyzed according to conditions as they existed when employer hired predecessor's employees).

■ The cause of action in this case arose on February 13, 1987, when Baker and Stunz, who had turned 60 by then, were denied employment as second officers. The

cause of action for Shannon, Ellis, and Hoffman apparently arose on the same date. In light of *Criswell II,* then, the continuity requirement was satisfied on the date the cause of action accrued. Thus we need not decide whether the continuity requirement was satisfied after the effective merger date.

Finally, Delta argues that it simply would be unfair to allow Baker and Stunz to wait until January 1989 to file a claim for a cause of action which arose in March 1987. Delta does not, however, explain why this would be unfair. The statute of limitations and the equitable doctrine of laches are more appropriate vehicles for arguing the vices of delay. Delta fails to raise either issue on appeal. We hold that the district court should have granted Baker and Stunz summary judgment on their successorship claim.

## II. *Admissibility of Exhibits.*

■ As we have indicated, Baker, Stunz,[2] and the Chambers Appellants (together "Appellants") appeal the adverse verdict on their ADEA claims, contending that the district court erred by excluding certain of their exhibits and admitting a particular defense exhibit. The ADEA makes it unlawful for an employer

(1) to fail or refuse to hire or to discharge any individual or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or]

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;

2. All appellants seek attorney's fees and any additional relief afforded under the ADEA. Thus Baker and Stunz, if they so decide, may remain parties to the ADEA claim despite our holding that they are entitled to summary judgment on their successorship claim.

3. Although Appellants mention that they are also appealing the district court's refusal to admit

. . . .

29 U.S.C. § 623(a) (1988).

■ Once the plaintiff establishes a prima facie case that age was a determining factor in the employment decision, the defendant-employer can rebut the prima facie case and/or assert any number of affirmative defenses. Among these defenses is the "reasonable factors other than age" defense ("RFOA defense"). 29 U.S.C. § 623(f)(1) (1988). The district court in this case instructed the jury that, to succeed on the RFOA defense, Delta must establish (1) that it actually has a policy prohibiting two-step downbidding and (2) that the policy was based on factors other than age. Delta maintained that it had a two-step downbidding rule because it promoted safety.

■ Appellants argue that the district court erred by refusing to admit Plaintiffs' Exhibits 87, 88, 9 and 10 as evidence relevant to rebutting Delta's RFOA defense, and by admitting Defendant's Exhibit 692. We review the district court's rulings for an abuse of discretion. *Pau v. Yosemite Park & Curry Co.,* 928 F.2d 880, 887 (9th Cir.1991). If an abuse of discretion is found, the error must be prejudicial to merit reversal and a new trial. *Roberts v. College of the Desert,* 870 F.2d 1411, 1418 (9th Cir.1988). In other words, "[t]o reverse, we must say that more probably than not, the error tainted the verdict." *Kisor v. Johns–Manville Corp.,* 783 F.2d 1337, 1340 (9th Cir.1986) (citing *Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983)).

### A. *Plaintiffs' Exhibits 87 and 88.*[3]

■ Appellants offered as Plaintiffs' Exhibit 87 a memorandum written in 1978 from Frank Rox, Delta's Senior Vice–President of Flight Operations, to Ron Allen, Delta's Senior Vice–President of Personnel. Copies were distributed to David Garrett, Delta's

Plaintiffs' Exhibit 90, they offer little discussion as to how the refusal constituted prejudicial error. The document says nothing regarding the existence of a two-step downbidding rule, nor does it discuss any rationale for such a rule. The district court did not abuse its discretion by not admitting the exhibit since it was irrelevant.

President, and C.A. Smith, Delta's Vice–President, who authored the February 13, 1987, letters refusing to employ Appellants as second officers. Relevant portions of the memorandum follow:

Subject: Mandatory Retirement—Pilots at Age 60

Ron [Allen], *we need to put our heads together concerning the positions we will take relative to mandatory retirement of pilots at age 60.*

While there is some litigation pending in various courts around the country on the propriety of the age 60 rule per se, *we will have a problem when some captain bids down to second officer and attempts to hold that seat beyond the normal age 60 retirement date.* This problem is compounded by the fact that we have had since the merger some former Northeast pilots who, because of a desire not to upgrade or because of physical impediments, have been occupying the second officer seat on our aircraft since the merger.

Quite frankly, *I would expect other captains who do not wish to retire at age 60 to bid down to second officer positions and since the regulations do not require the pilot's license to occupy this job, we will undoubtedly end up in some hard decision making over what to do.*

*My preliminary thoughts are that we should bend every effort to preserve the sanctity of a pilot cockpit.* I am sending our lawyers a copy of this memorandum and ask that they start giving some thought to how we approach this problem.

....

(Emphasis added.)

Plaintiffs' Exhibit 88 is another memorandum written in 1978 by Rox to Garrett. The memorandum, in pertinent part, follows:

Subject: Age of Flight Crew Members

As we discussed recently, *we will soon be faced with taking a stand concerning the retirement of flight crew members who, for personal reasons, seek to retain a seat in the Second Officers positions beyond the mandatory retirement age of 60 years now imposed upon all pilots.* As you know, it is not necessary under the FAR's that Second Officers possess pilot certificates.

. . . . .

As you know, the age 60 retirement requirement is embodied in Delta's Pilots Retirement Plan and also is mandated by a BFOQ (bona fide occupational qualification). As a result of the 1978 amendments to the ADEA, we may not subsequently rely upon our pre-existing retirement plan to force retirement at ages below 70....

Section 4(f)(1) of the ADEA establishes a BFOQ exception. You know we have requested that all of our cockpit crew members be qualified pilots and we have had a formal (albeit not in the contract) policy that all such pilots should possess unrestricted first class medical certificates. We have deviated from these requirements in the following instances, however: ... (3) We have agreed with Duffy [union president] to put Sexton back, effective September 25, in a Second Officers position. *While we have not yet been faced with the problem of a currently qualified Captain or First Officer bidding down to the Second Officers position in order to escape the mandatory age 60 retirement requirement of the FAR's,* this is sure to come for Delta and there are a couple of cases in the courts involving other carriers on this identical subject.

In establishing a BFOQ for Delta it would, of course, be better if we did not have Winard and O'Neal working under restricted first class medical certificates, and if we had not agreed to put Sexton back under a similar restricted certificate. It would also be better if we had not "grandfathered" the former Northeast pilots into the Second Officer seat. But, we have, and there's no turning back on these matters at this juncture. On the other hand, *I think we should fight with all vigor any attempt of a Captain to bid down to a Second Officer position in order to avoid mandatory retirement at age 60 as a pilot....*

....

(Emphasis added.)

The district court sustained Delta's objection to admitting these exhibits on the ground that they would create confusion and unfair prejudice and waste time so as to

outweigh their probative value. *See* Fed. R.Evid. 403. In denying Appellants' motion for reconsideration, the court stated:

> I think there is some relevancy [of Plaintiffs' Exhibits 87 and 88], but I think it's quite marginal. And given the date of 1978, not only its age, but the fact that that is the time when people were responding to the ADEA, that it's an issue that would divert the attention, I think, of the jury from the real issue of the case. And so I think, although there is some relevancy, it leads to an undue consumption of time without any, I think, real benefit to the real issues. So I continue to sustain the objection to 87 and 88.

The court reiterated its conclusion when denying Appellants' post-judgment motion for a new trial:

> [T]he relevance of Exhibits 87 and 88 is highly attenuated. These documents address only an inference in 1978 (before *Iervolino*) and do not directly address Delta's policy or practice in the period involved in this action, particularly since there was a change in management personnel. Any probative value is substantially outweighed by unfair prejudice, confusion and waste of time.

All relevant evidence is generally admissible. Fed.R.Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. A court may exclude relevant evidence, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

Appellants rebutted Delta's RFOA defense by arguing (1) that Delta did not have a policy prohibiting two-step downbidding and (2) that even if Delta had such a policy, it was not based on an age-neutral rationale. Plaintiffs' Exhibits 87 and 88 are relevant to both contentions.

Regarding whether Delta had a two-step downbidding rule, Appellants argued that the absence of documentation of the policy made it unlikely that Delta had such a rule. Delta countered by arguing that the policy was longstanding, presenting it as virtually a company custom. It offered the testimony of Harry Alger, Delta's Vice–President of Flight Operations since 1987, to support its position. Alger testified that the policy existed "as long as [Delta] ha[s] been a corporate entity." He testified that he had the authority to retain or abandon policies of his predecessors and that he chose to retain the two-step downbidding rule because he believed it promoted safety.

The discussion in the 1978 memos of how to handle two-step downbidding attempts *in the future* was probative of the fact that Delta did not have a rule prohibiting two-step downbidding in 1978. Although that fact in itself says nothing as to whether Delta had such a rule in 1987, it becomes significant when one considers Delta's position that the policy had existed since the company's inception. If Delta did not have the two-step downbidding rule in 1978, then it did not have the policy since the company's inception. This makes it less probable that Alger retained the allegedly longstanding policy, which, in turn, makes it more probable that Delta manufactured the rule in response to this litigation. Accordingly, the fact that there was little, if any, documentation of the two-step downbidding rule combined with proof that Delta did not have a longstanding company policy for Alger to retain is highly relevant to support the contention that Delta had no such rule when it informed Appellants in 1987 that the rule precluded their employment as second officers.

Regarding the rationale for the two-step downbidding rule, Delta presented evidence that having a former captain serving as a second officer would undermine the lines of authority in the cockpit, producing a sort of "back seat driver" syndrome which would jeopardize flight safety. Thus Delta claimed to have a policy prohibiting two-step downbidding regardless of age. Appellants rebutted Delta's position with evidence that two-step downbidding did not undermine safety. They sought to prove that Delta's policy, if it had one, was age-based.

Assuming that Delta had a longstanding rule prohibiting two-step downbid-

ding which Alger merely retained, the rationale of the rule at its inception is probative of the rationale for the policy in 1987. The exhibits strongly suggest that the reason for a policy prohibiting two-step downbidding was to prevent 60–year–old pilots from serving as second officers. The exhibits make no reference to the "back seat driver" syndrome. Plaintiffs' Exhibit 87 identifies the prospect of employees over 60 serving as second officers as a "problem" requiring some "hard decision making over what to do." Plaintiffs' Exhibit 88 again refers to the potential for two-step downbidding of retired pilots as a "problem." In that exhibit, Delta's senior vice-president states that the company *"should fight with all vigor* any attempt of a Captain to bid down to a Second Officer position *in order to avoid mandatory retirement at age 60 as a pilot"* (emphasis added). Although Delta may have changed its rationale for the two-step downbidding rule since 1978, Appellants were entitled to present to the jury the written dialogue opposing downbidding *by 60–year–old pilots* that occurred among Delta's top brass in 1978. Considering the relation of Plaintiffs' Exhibits 87 and 88 to both the existence and rationale of the two-step downbidding rule, the district court's statement that the exhibits were only marginally relevant was erroneous.

■ We must decide whether the district court abused its discretion in balancing the level of probative value of Plaintiffs' Exhibits 87 and 88 against the potential for undue prejudice, confusion, and wasted time. *See Rogers v. Raymark Indus.*, 922 F.2d 1426, 1430 (9th Cir. 1991). The jury's attention may have been diverted had the exhibits been relevant only to the existence and rationale of the two-step downbidding rule in 1978. Because the exhibits were also highly relevant to the existence and rationale of Delta's policy in 1987, however, the jury's attention would not have been diverted.

Moreover, we are skeptical that introducing the exhibits would have wasted time. Although Delta claims that it would have been forced to offer its own historical exhibits and testimony had the plaintiffs' exhibits been admitted, it offers nothing to support its contention that such evidence existed. Indeed, we find it hard to believe that Delta would not already have introduced such evidence had it existed.

■ Accordingly, despite our respect for the learned trial judge, we find that the district court abused its discretion by refusing to admit Plaintiffs' Exhibits 87 and 88. Moreover, the court's error was not harmless. These exhibits were documentary evidence crucial to Appellants' claim that Delta lacked an age-neutral rule prohibiting two-step downbidding. Their exclusion more probably than not tainted the verdict in this case because the jury was deprived of the only documentary evidence establishing Appellants' claim that the two-step downbidding rule never existed and that, if the policy did exist, it was based on age.

### B. *Plaintiffs' Exhibits 9 and 10.*

■ Plaintiffs' Exhibits 9 and 10 are compilations from Delta records listing Delta pilots who moved into first officer positions, a process known as "one-step downbidding." The documents showed that Delta permitted 1,164 one-step downbids between May 1973 and April 1989. The district court sustained Delta's objection to admitting these exhibits, finding that the marginal relevance of the exhibits was outweighed by the danger of confusion and wasted time. *See* Fed.R.Evid. 403.

Appellants argue that Plaintiffs' Exhibits 9 and 10 were relevant to the legitimacy of the safety rationale Delta offered for its two-step downbidding rule. They contend that because one-step downbidding presented the same "back seat driver" syndrome as two-step downbidding, the fact that Delta has frequently permitted one-step downbidding undermines its proffered safety rationale. Thus Appellants' theory of relevance is premised on a factual hypothesis, i.e. that one-step downbidding presented the same safety concerns as two-step downbidding. The district court, however, determined that Appellants' hypothesis was false and concluded that any relevance of the exhibits was highly attenuated.

Fed.R.Evid. 104(b) states that "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence *sufficient to support a finding* of the fulfillment of the condition" (emphasis

added). We need not decide whether the district court erred under Rule 104(b) in finding that there was insufficient evidence that one- and two-step downbidding presented the same safety concerns, because the court did not abuse its discretion in excluding the exhibits under Rule 403. The district court decided that if it permitted Appellants to introduce the exhibits, "the defense would go into a lot of evidence as to why people engage in one-step down-bids, which is to await the promotion." Therefore, unlike Plaintiffs' Exhibits 87 and 88, the relevance of Plaintiffs' Exhibits 9 and 10 was predicated on a factual hypothesis which was itself in dispute. The debate over the validity of the hypothesis might have consumed considerable time and distracted the jury from its focus on two-step downbidding.[4] Unlike Plaintiffs' Exhibits 87 and 88, then, excluding Exhibits 9 and 10 was within the court's discretion.

█ Furthermore, any error in excluding Exhibits 9 and 10 was harmless. Appellants were able to introduce evidence at trial that "hundreds" of one-step downbids had occurred over the time period in question. In fact, Appellants argued this fact to the jury during closing argument. Thus although the documentary evidence of Delta's history permitting one-step downbids may have been more persuasive evidence of the pervasiveness of the practice, the jury already had undisputed evidence that the practice occurred.

While we find no abuse of discretion in excluding the exhibits, the judge, of course, in his discretion, is free to reconsider this decision upon retrial.

#### C. Defendant's Exhibit 692.

█ Defendant's Exhibit 692 is a legal brief prepared in 1981 by Delta's Senior Vice–President Rox regarding an FAA proposal relating to functionally limited FAA medical certificates. Within the thirteen-page document was the following statement:

[T]he issuance of functionally limited First Class Medical Certificates to disabled pilots resulted in a cockpit composition where former pilots-in-command were placed in the position of first and second officer, and placed above them in authority were pilots who previously had been their subordinates. *Delta's management believes that this situation has a chilling effect upon command authority which adversely affects members of the crew and could adversely affect the safety of the flight.*

(Emphasis added.) The district court admitted the exhibit over Appellants' objections that the document was irrelevant, prejudicial, and inadmissible hearsay.

Delta offered the document to prove that it had a policy prohibiting two-step downbidding before it denied Appellants positions as second officers. Although the document does not explicitly state that such a policy existed as of 1981, it does support an inference to that effect. Hence it makes more probable a fact material to the case. *See* Fed.R.Evid. 401.

█ As to the hearsay objection, Delta contends that the document is not hearsay because it was not admitted to prove the truth of the matters asserted therein, i.e. that Delta's management believed two-step downbidding had a chilling effect on cockpit command authority. *See* Fed.R.Evid. 801(c). Rather, Delta argues that the document itself was evidence that a two-step downbidding policy existed at the time. We agree that for the limited purpose of proving the existence of the policy, rather than the rationale for the policy, the document was not hearsay. *Cf. United States v. Castro,* 887 F.2d 988, 1000 (9th Cir.1989) (reports not introduced for their contents but rather to show information available not hearsay); *Stendebach v. CPC Int'l, Inc.,* 691 F.2d 735, 739 (5th Cir. 1982) (documents admitted "were not offered to prove the truth of but merely the fact of their contents"), *cert. denied,* 461 U.S. 944, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983). The

---

4. Although this same concern may have been applicable to the general statements that Delta permitted one-step downbidding, *see infra,* introducing a list of pilots who bid down to the first officer position might have encouraged Delta to explain the circumstances of each case. Thus, admitting Plaintiffs' Exhibits 9 and 10 presented a greater risk of confusion and wasted time than did admitting the general statements regarding one-step downbidding.

district court did not abuse its discretion in admitting Defendant's Exhibit 692.[5]

### III. Whether Delta's Violation of the ADEA Was "Willful."

Delta appeals the district court's denial of its motion for a directed verdict and for judgment notwithstanding the verdict ("JNOV") regarding the jury's finding that Delta's age–60 rule constituted a "willful" violation of the ADEA. We review the denial of both motions de novo. *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir.1992) (per curiam). The inquiry is the same as in the district court. We "must determine whether the evidence, considered as a whole and viewed in the light most favorable to the nonmoving party, reasonably can support *only* a verdict for the moving party." *Id.* A directed verdict or JNOV is appropriate only where " 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion.' " *Yeaman v. United States*, 584 F.2d 322, 326 (9th Cir.1978) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)).

 A plaintiff is entitled to liquidated damages for "willful" violations of the ADEA. 29 U.S.C. § 626(b) (1988). A violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128, 105 S.Ct. 613, 625, 83 L.Ed.2d 523 (1985). An employer's violation is not willful if it "acted reasonably and in good faith in attempting to determine whether [its employment policies] violate[d] the ADEA." *Id.* at 129, 105 S.Ct. at 625. For the employer to be in willful violation of the ADEA it must do more than act unreasonably; it must act with knowing or reckless disregard for the ADEA's requirements. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n. 13, 108 S.Ct. 1677, 1682 n. 13, 100 L.Ed.2d 115 (1988).

Delta claims the district court should have found as a matter of law that it acted in good faith because Delta relied on an Eleventh Circuit opinion affirming a jury's finding that Delta's age–60 rule is lawful. In *Iervolino v. Delta Air Lines, Inc.*, 796 F.2d 1408, 1419 (11th Cir.1986), *cert. denied*, 479 U.S. 1090, 107 S.Ct. 1300, 94 L.Ed.2d 155 (1987), the court stated:

> We also conclude that the BFOQ [bona fide occupational qualification] defense was amply supported by the record. With respect to the first prong of this defense (whether the age–60 rule is reasonably necessary to the safe transportation of passengers), Delta introduced ample evidence, including accident reports and the testimony of pilots, to show that the improper performance of a [Second Officer's] duties could adversely affect flight safety, especially during emergencies.... There was also ample evidence in the record to establish the second prong of the BFOQ defense (either that all or substantially all individuals in the excluded group could not safely and efficiently perform the job [of Second Officer] or that it would be impossible or highly impractical to predict which individuals would be unable to perform the job). For example, Delta presented expert testimony that certain age-related diseases become more prevalent at the age of 60 and that medical science is presently unable to predict which individuals will be affected by these diseases.

*Id.* (citations omitted).

The district court in the instant case, in denying Delta's JNOV motion, reasoned as follows:

> Delta relies primarily on the "approval" of its BFOQ defense as to flight engineers in [*Iervolino* ]. That case held that the evidence was sufficient to support a 1984 verdict that age 60 was a BFOQ for flight engineers. In the context of this case, tried seven years after *Iervolino*, that holding means only that a reasonable jury could find that age 60 was a BFOQ—not that it was required to so find. Expert

---

5. We note that the district court's admission of Defendant's Exhibit 692 reinforces our holding that the court erred by excluding Plaintiffs' Exhibits 87 and 88. Notably, both the plaintiffs' and defendant's exhibits were written by the same author years before Appellants were denied employment as second officers. Both sets of exhibits were offered on the issue of whether Delta had an age-neutral two-step downbidding rule. The district court admitted Delta's exhibit, but excluded Appellants' exhibits. Both sets of exhibits should have been admitted.

testimony in this case supports a finding that in the years since *Iervolino* was tried, much knowledge has been gained in gerontology and the process of aging and, on the basis of that advance in scientific knowledge, that it no longer is reasonable to rely on age 60 as a proxy for other disqualifying factors. In addition, Delta was aware that every other domestic airline had ceased to enforce the age 60 rule against its second officers without any untoward consequences. The evidence is sufficient to support the verdict that, at least, Delta acted in reckless disregard of whether or not its continued enforcement of the age 60 rule against flight engineers violated the ADEA.

Although the district court pointed out that the *Iervolino* decision meant a jury could find Delta's age–60 rule lawful, not that it must so find, the issue is not whether Delta was entitled to a directed verdict on the lawfulness of its age–60 rule. Rather, the issue is whether a prior finding of lawfulness compels the finding that Delta acted in good faith. Whether Delta's reliance on *Iervolino* constitutes good faith as a matter of law is a close question.

*Iervolino*'s appeal was decided in 1986 and certiorari was denied in 1987. Oppenheim turned 60 years old on April 7, 1988, and the decision denying him continuing employment was made prior to that date. There is little evidence of any significant change in the medical knowledge or other relevant factors applicable to a second officer's qualifications in the less than four years that elapsed between the trial in *Iervolino* and Delta's decision to deny Oppenheim continued employment.

Various courts have found an employer's reliance on legal advice evidence of a good faith attempt to comply with the ADEA. *Thurston*, 469 U.S. at 129, 105 S.Ct. at 625 (because airline policy was product of consultation among lawyers and company executives, finding of willfulness reversed); *Equal Employment Opportunity Comm'n v. Wyoming Retirement Sys.*, 771 F.2d 1425, 1431 (10th Cir.1985) (affirming finding that defendants' reliance on advice given by Wyoming Attorney General that policy was lawful constituted good faith). *But see Uffelman v. Lone Star Steel Co.*, 863 F.2d 404, 409 (5th Cir.) (seeking legal advice from corporate counsel does not *ipso facto* establish good faith), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989). Although the district court correctly held that Delta had not relied on the legal advice of its counsel in maintaining the age–60 rule, we agree with Delta that an Eleventh Circuit case affirming a jury's finding that its age–60 rule is lawful matches or exceeds the importance of the legal advice evidencing good faith in these cases.

Even had Delta's reliance on *Iervolino* evidenced good faith as a matter of law, Oppenheim contends that the jury could have disbelieved that Delta actually relied on the case in keeping the age–60 rule. *See Uffelman,* 863 F.2d at 409 (in making willfulness determination, jury was "entitled to weigh the credibility of witnesses and to disbelieve self-serving testimony"). Delta Vice-president Alger testified that he was not concerned that Delta's policies might be unlawful because "Delta was sued several years ago, some six or seven years ago—*Iervolino v. Delta.* And Delta prevailed, won the suit on the same basic issues that we are talking about today." Alger also cited the case in an April 1988 letter discussing the age–60 rule:

Delta has successfully defended this policy in Court in the case of *Iervolino v. Delta* in which the jury found that Delta's policy was not unlawful in any respect. The Court of Appeals affirmed the jury's verdict by finding that there was substantial evidence ... to support [the] bona fide occupational qualification defense[ ].

Alger also testified that his "staff" had advised him that there had been no substantial change in medical evidence since the *Iervolino* decision.

Oppenheim maintains that Alger's credibility in relying on *Iervolino* was undermined when he purportedly implied that the outcome of *Iervolino* may have been different had the plaintiff been a more respected pilot. We do not find sufficient evidence to support Oppenheim's speculation that the jury disbelieved Alger's reliance on *Iervolino*.

Given the deference courts have afforded employers who have relied on legal advice, we find Delta's reliance on *Iervolino* constituted good faith as a matter of law.

**646**

## CONCLUSION

We reverse the district court's denial of summary judgment for Appellants Baker and Stunz based on the claim of Delta's liability as a successor to Western. As to the evidentiary issues, we hold that the district court's exclusion of Plaintiffs' Exhibits 87 and 88 was reversible error warranting a new trial. Finally, we reverse the district court's denial of Delta's directed verdict and JNOV motions regarding the jury's finding of willfulness. Accordingly, we remand the case to the district court for further proceedings consistent with this opinion.

Appellants Baker, Chambers, Huerta, McMullen, Ryan, Stokes, and Stunz are awarded costs on their appeal against Delta. The award of attorneys' fees must await final determination on the merits of their claims. *Bentler v. Bank of America*, 959 F.2d 138, 142 n. 6 (9th Cir.1992). Delta is awarded costs of its cross-appeal against Oppenheim.

AFFIRMED in part, REVERSED in part, and REMANDED.

## ORDER

Dec. 9, 1993.

The petition for rehearing of cross-appellee, Alvin C. Oppenheim is granted.

The petition for rehearing of defendant-appellee Delta Air Lines, Inc. concerning the award of attorneys' fees is granted. The petition for rehearing is otherwise denied.

The opinion filed September 30, 1993, is amended by deleting the first paragraph from the slip opinion at page 11032, and inserting in its place the following:

[Editor's Note: Amendments incorporated for bound volume publication.]

Judges Browning and Thompson reject the suggestion for rehearing en banc and Judge Boochever recommends rejection of the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. (Fed.R.App.P. 35.)

The suggestion for rehearing en banc is denied.